# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| Blake Chapman, *et al.* | § | |
| | § | |
| individually and on behalf of all others similarly situated, | § | **C.A. No. 2:17-cv-00174** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| vs. | § | |
| | § | |
| voestalpine Texas LLC, *et al.,* | § | |
| | § | |
| **Defendants.** | § | **FED. R. CIV. P. 23 CLASS ACTION** |
| | § | |

---

## PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

---

**TO THE HONORABLE NELVA GONZALES RAMOS:**

Plaintiffs—Blake Chapman, Ricky Stephens, Gary Thurmond Jr. and Carolyn Thurmond; Hortensia Martinez; Charles Garrett, and Roel Garcia individually and on behalf of all others similarly situated ("Representative Plaintiffs" or "Plaintiffs")—respectfully move this Court to preliminarily approve the Class Action Settlement Agreement ("Agreement") entered into between Plaintiffs and Defendants voestalpine Texas LLC, voestalpine US Holding LLC (f/k/a voestalpine Texas Holding LLC, and voestalpine Texas Holding LLC (collectively "Defendants"), to certify, for settlement purposes only, the proposed Rule 23 Class identified herein, and set a fairness hearing to address the same. A copy of the Agreement is attached as Exhibit 1 to this Motion. Defendants do not oppose the filing of this motion.

This Motion is based on the Declarations of Austin Anderson, Stuart White, and Roe Frazer as Class Counsel, the associated exhibits, and the entire record of the Consolidated Action(s).

Date: October 15, 2021                    Respectfully submitted,

**ANDERSON ALEXANDER, PLLC**

By:*/s/ Clif Alexander*
    **Clif Alexander**
    Federal I.D. No. 1138436
    Texas Bar No. 24064805
    clif@a2xlaw.com
    **Austin W. Anderson**
    Federal I.D. No. 777114
    Texas Bar No. 24045189
    austin@a2xlaw.com
    **Lauren E. Braddy**
    Federal I.D. No
    Texas Bar No. 24071993
    lauren@a2xlaw.com
    819 N. Upper Broadway
    Corpus Christi, Texas 78401
    Telephone: (361) 452-1279
    Facsimile: (361) 452-1284

**LILES WHITE PLLC**

By:*/s/ Stuart R. White*
    **Stuart R. White**
    Federal I.D. No. 11448833
    Texas Bar No. 24075268
    stuart@lileswhite.com
    **Kevin W. Liles**
    Federal I.D. No. 21501
    Texas Bar No. 00798329
    kevin@lileswhite.com
    500 N. Water Street, Suite 800
    Corpus Christi, Texas 78401
    Telephone: (361) 826-0100
    Facsimile: (361) 826-0101

**FRAZER PLC**

By: */s/ T. Roe Frazer II*
    **T. Roe Frazer II** (Admitted *Pro Hac Vice*)
    Tennessee Bar No. 35785
    roe@frazerlaw.com
    1 Burton Hills Blvd., Suite 215
    Nashville, Tennessee 37215
    Telephone: (615) 647-0990

***Attorneys in Charge for Plaintiffs and the Class Members***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. v

I. Introduction ........................................................................................................... 1

II. Statement of Facts ................................................................................................. 2

    A. Overview of voestalpine's Business Operations ............................................ 2

    B. The Origins of the Litigation ......................................................................... 2

    C. Discovery and Case Development .................................................................. 3

    D. History of Settlement Negotiations and Mediation ....................................... 4

III. Summary of Settlement Terms .............................................................................. 5

    A. Individuals Included in the Proposed Settlement Class ................................. 5

    B. Total Settlement Value ................................................................................... 6

    C. Scope of Applicable Release ........................................................................ 10

    D. Settlement Administration Process .............................................................. 13

        1. Class Member Identification Plan ........................................................ 14

        2. Notice Distribution Plan ...................................................................... 15

        3. Notice Period ........................................................................................ 17

            a. Procedure to Return Claim Form and Documentation .................. 17

            b. Procedure to object to, or opt-out of, the settlement ................... 18

        4. Allocation Method for Distribution of Net Settlement Amount ................. 20

    E. Attorneys' Fees ............................................................................................ 21

    F. Service Awards ............................................................................................. 21

IV. Argument & Authorities ...................................................................................... 21

    A. Judicial Policy Favors Pre-Trial Settlement of Class Action Lawsuits ................... 21

    B. Standard for Preliminary Approval of the Class Settlement ........................ 22

    C. The Proposed Settlement Merits Preliminary Approval .............................. 24

        1. There Is No Reason to Doubt the Fairness of the Settlement ............... 24

        2. There Are No Deficiencies in the Settlement ...................................... 25

        3. The Settlement Does Not Improperly Grant Preferential Treatment to Representative Plaintiffs or any Segment of the Class ......................... 26

        4. The Agreement Does Not Excessively Compensate Class Counsel ............... 27

        5. The Settlement Is Within the Range of Reasonableness ..................... 27

    D. The Class Certification Requirements of Rule 23 are Satisfied .................. 29

        1. The Proposed Class Satisfies the Rule 23(a) Factors ......................... 30

a.   Numerosity ........................................................................... 30

b.   Commonality ......................................................................... 31

c.   Typicality .............................................................................. 33

d.   Adequacy of Representation .................................................. 34

    i.   Adequacy of Representative Plaintiffs ............................. 34

    ii.  Adequacy of Class Counsel ............................................. 36

2.   Representative Plaintiffs Satisfy the Rule 23(b)(3) Factors ............. 37

a.   Predominance ....................................................................... 38

b.   Superiority ............................................................................ 39

    i.   Interest in Individually Controlling Separate Actions ......... 40

    ii.  Extent of Litigation Already Begun and Desirability of Concentrating Claims in the Corpus Division of the Southern District of Texas ................................. 40

    iii.  Difficulties Managing Class Action .................................. 41

E.   The Notice, and Notice Plan, Constitute the Best Practical Notice ........................ 41

V.   Conclusion ......................................................................................................... 43

Index of Exhibits ...................................................................................................... 46

**TABLE OF AUTHORITIES**

**Cases**

*In re Corrugated Container Antitrust Litigation*, 643 F.2d 195 (5th Cir. 1981) ................................................ 42

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) .......................................................................... Passim

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) ...................................................................... 22

*Berger v. Compaq Corp.*, 257 F.3d 475 (5th Cir. 2001) ......................................................................... 34

*Bert v. AK Steel Corp.*, No. 1:02-CV-467, 2008 WL 4693747 (S.D. Ohio Oct. 23, 2008) ...................... 25

*Booth v. Galveston Cty.*, No. 3:18-CV-00104, 2019 WL 1129492 (S.D. Tex. Mar. 12, 2019) ........... 33, 34

*C.f., Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ................................................. 24

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ................................................................................ 22

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) .................................................... 25, 27

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .......................................................................... 41

*Evans v. Jeff D.*, 475 U.S. 717 (1986) .......................................................................................... 21

*Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005) .......................................................... 35

*Flecha v. Medicredit, Inc.*, 946 F.3d 762 (5th Cir. 2020) .................................................................. 30

*Gonzalez v. O.J. Smith Farms, Inc.*, No. 5:20-CV-00086-FL, 2020 WL 7388435 (E.D.N.C. Dec. 16, 2020) .................................................................................................................................. 22

*Gunnells v. Health Plan Services, Inc.*, 348 F.3d 417 (4th Cir. 2003) cert. den., *Healthplan Services, Inc. v. Gunnells*, 542 U.S. 915 (2004) ........................................................................................ 22

*Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016) ............................................................................... 33, 39

*In re A.H. Robins*, 880 F.2d 709 (4th Cir. 1989), cert. den., 493 U.S. 959 (1989) ......................... 22

*In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ................................................................ 33

*In re Heartland Payment Sys.*, 851 F. Supp. 2d 1040 (S.D. Tex. 2012) ........................................ 29

*In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010) ............................................ 41

*In re OCA, Inc. Secs & Derivative Litig.*, Civ. A. No. 5-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) ................................................................................................................................. 24

*In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013) ...................................................................... 39

*Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468 (5th Cir. 1986) ...................................................... 38

*Kidwell v. Transportation Communications International Union*, 946 F.2d 283 (4th Cir. 1991) ............ 22

*King v. United SA Fed. Credit Union*, 5:09-cv-00937-NSN (W.D. Tex. Oct. 8, 2010) ......................... 27

*Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 650 (N.D. Tex. 2010) ............................................. 25

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ................................................................ 33

*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012) ............................................. 31, 32

*Madison v. Chalmette Ref., LLC*, 637 F.3d 551 (5th Cir. 2011) .................................................... 38

*Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ................................................................. 22

*Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013) ............................................................ 23

*McMiller v. Bird & Son, Inc.*, 68 F.R.D. 339 (W.D. La. 1975) .................................................... 31

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ......................................... 41

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999) ....................................... 31

*ODonnell v. Harris Cty., Texas*, No. CV H-16-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017) ................................................................................................................................................ 35

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir.1999) ........................................................... 41

*Rodger v. Electronic Data Systems Corp*, 160 F.R.D. 532 (E.D.N.C. 1995) ............................... 22

*Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ................................................................................................................................... 30, 33

*Silva–Arriaga v. Tex. Express*, Inc., 222 F.R.D. 684 (M.D. Fla. 2004) ...................................... 31

*Sterling v. Veliscol*, 855 F.2d 1188 (6th Cir. 1988) ........................................................ 32, 33, 39

*Stirman v. Exxon Corp.*, 280 F.3d 554 (5th Cir. 2002) ............................................................... 36

*Stoffels v. SBC Commc'ns, Inc.*, 238 F.R.D. 446 (W.D. Tex. 2006) ............................................ 35

*Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D. La. 2007) ..................................... 22

*United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826 (5th Cir. 1975 ........................... 22

*Vaughn v. Am. Honda Motor Co.*, 507 F.3d 295 (5th Cir. 2007) ........................................... 41, 42

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................................ 31, 34

*Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992) .............................................................. 38

*Welsh v. Navy Fed. Credit Union*, No. 5:16-CV-1062-DAE, 2018 WL 7283639 (W.D. Tex. Aug. 20, 2018) ...................................................................................................................................... 41

*Winingear v. City of Norfolk*, No. 2:12CV560, 2014 WL 12526327, at *1 (E.D. Va. June 5, 2014) ................................................................................................................................................ 23

*Wolfe v. Anchor Drilling Fluids USA Inc.*, No. 4:15-cv-1344, 2015 WL 12778393 (S.D. Tex. Dec. 7, 2015) ......................................................................................................................................... 27

## Other Authorities

Newberg on Class Actions (3rd ed. 1992) ................................................................................. 2, 23

Newberg on Class Actions (4th ed. 2002) ............................................................................... 33, 34

Newberg on Class Actions (5th ed. 2011) .............................................................................. Passim

Manual for Complex Litigation (4th ed. 2004) ....................................................................... 23, 24

## Rules

Fed. R. Civ. P. 23 ................................................................................................................... Passim

# I.
# INTRODUCTION

By Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement ("Motion"), Representative Plaintiffs[1] seek entry of a Preliminary Approval Order finding that: (1) the Agreement is fair, reasonable and adequate and thus sufficient to promulgate notice of settlement to the Class; (2) the Agreement is within the range of possible judicial approval; (3) the Agreement was negotiated and entered into at arm's-length, in good faith, and free of collusion; (4) the requirements for certifying the Class under Rule 23(a) and Rule 23(b)(3) have been met; and (5) Class Members shall be notified of the terms of the Agreement and of their rights in connection therewith.

In addition, Plaintiffs respectfully request that the Court: (1) approve the form and method of providing Class Members notice of settlement; (2) approve the appointment of he Special Master and the Claims andminstrator, and the Claims Program to be utilized by the Special Master in allocating the settlement proceeds to the Participating Class Members; (3) approve the proposed Claim Form; (4) schedule a fairness hearing to determine whether the Agreement should be given final approval ("Fairness Hearing"); (5) establish dates for the dissemination of the Notice Packet, opt-outs, and objections to the Agreement and other relevant deadlines; and (6) continue the stay of litigation of claims pending final approval of the Agreement.

---

[1] Capitalized terms used in this Motion have the same meaning as those defined in the Agreement.

# II.
# STATEMENT OF FACTS

## A.    OVERVIEW OF VOESTALPINE'S BUSINESS OPERATIONS[2]

Approximately five (5) years ago, a new industrial plant—Defendants' La Quinta Plant—made Portland, Texas its home.  Defendants are related entities that are part of a family of companies based in Austria that are world leaders in the manufacture, processing, and development of steel products.[3] The Plant is a 360-ton-per-hour and 2,205,000 ton-per-year Direct Reduced Iron ("DRI")/Hot Briquette Iron ("HBI") production plant located near the La Quinta Ship Channel (the "Ship Channel") at 2800 La Quinta Terminal Road, Portland, Texas ("La Quinta Plant"). The La Quinta Plant was built to be the largest and most advanced plant in the world for manufacturing HBI—a sophisticated "pre material" used in steel production—and is to date, voestalpine's largest ever foreign investment.  It is the only facility in the United States that manufactures HBI.

## B.    THE ORIGINS OF THE LITIGATION

On May 22, 2017, Class Counsel filed the first of three lawsuits against Defendants for damages allegedly caused by Dust migrating from Defendants' La Quinta Plant.[4] *See Chapman, et al. v. voestalpine Texas LLC, et al.*, No. 2:17-cv-00174, ECF No. 1 (S.D. Tex.) ("*Chapman* Litigation"). While the *Chapman* Litigation was initially filed as a class action, the representative claims were dropped in the Third Amended Complaint filed January 24, 2018. *See id.* at ECF Nos. 1 and 40. On January 29, 2019, Class Counsel filed a separate class action against Defendants seeking injunctive relief along

---

[2] Defendants are Delaware limited liability companies ultimately wholly owned by Austrian entities. Defendants and the other entities operating under the voestalpine umbrella will be collectively referred to as "voestalpine."

[3] *See* http://www.voestalpine.com/texas/en/Company

[4] Class Counsel also filed *Ocean View Development, Ltd., et al. v. voestalpine Texas LLC, et al.*, No. 2:17-cv-00332, ECF No. 1 (S.D. Tex.) on behalf of commercial business owners. Those entities are not included within this Class and that matter has been separately resolved.

with individual claims for damages to real and personal property on behalf of 149 individuals residing in Portland, Texas and Gregory, Texas. *Abben, et al. v. voestalpine Texas LLC, et al.*, No 2:19-cv-32, ECF No. 1 (S.D. Tex. 2019). The next day, on January 30, 2019, Class Counsel filed a third lawsuit, *Thurmond, et al. v. voestalpine Texas LLC, et al.*, No. 2:19-cv-34, ECF No. 1 (S.D. Tex.), as a representative action alleging vehicle damage caused by Defendants' activities at the La Quinta Plant, along with individual claims for injunctive relief. These three filings have now been consolidated into one action before this Court, for settlement purposes only.

## C.     DISCOVERY AND CASE DEVELOPMENT

During the pendency of these Consolidated Actions, counsel for both Plaintiffs and Defendants to the lawsuits (hereinafter referred to as the "Parties") engaged in significant factual discovery and expert investigations. Specifically, the Parties exchanged over 360,343 pages of documents through formal written discovery, over 82,611 documents were subpoenaed from third parties, and an additional 1,677 documents were obtained through Freedom of Information Act requests from third-party entities. The Parties also scheduled a site inspection of Defendants' La Quinta Plant, whereby Class Counsel and Plaintiffs' experts were granted access to the Plant. During that site inspection, Plaintiffs' experts took considerable sampling and documented production activities. In addition to inspecting Defendants' La Quinta Plant, Class Counsel arranged for regular and extensive inspection and sampling from residences and vehicles located within the Class Area over a one-year period. Defendants likewise retained experts who performed their own independent investigations and sampled evidence from residences and vehicles within the Class Area.  In total, the Parties retained twenty-two (22) experts—Plaintiffs retained ten (10) and Defendants retained twelve (12). These experts each subsequently provided comprehensive reports on the issues of liability and damages.

In addition to fully engaging in written and expert discovery, both parties took multiple depositions. Plaintiffs deposed five (5) of Defendants' representatives, including executive officers and department managers of the facility and including one manager of the voestalpine steel division company from Austria, and Defendants deposed thirteen (13) individual plaintiffs from the *Chapman* Matter. It was only after both sides provided their expert reports (and after Class Counsel filed the Opposed Motion for Class Certification in the *Thurmond* Matter) that the Parties agreed to participate in mediation.

**D.    HISTORY OF SETTLEMENT NEGOTIATIONS AND MEDIATION**

The Parties selected John W. Perry, Jr. with Perry, Balhoff, Mengis, and Burns, L.L.C. to serve as the neutral third-party mediator. Mr. Perry has served as a Special Master and Court-Appointed Mediator in federal and in state court. For instance, in federal court, Judge Carl J. Barbier in the Deepwater Horizon case chose Mr. Perry to recommend a plan to allocate a settlement totaling $2.3 billion, and then appointed him as Special Master to allocate the common benefit fee; Judge Eldon E. Fallon appointed him as Special Master to implement the class settlement in the Chinese Drywall litigation; and Judge Jesse M. Furman appointed him as Special Master to implement the settlement in the General Motors LLC Ignition Switch litigation, a case which Mr. Perry had previously mediated.[5]

The Parties' initial call with Mr. Perry occurred on June 18, 2019. During that call the Parties appraised Mr. Perry of the current case posture and created a plan whereby they would work toward formal mediation. Both Plaintiffs and Defendants subsequently had one-on-one meetings with Mr. Perry to discuss the outstanding legal issues they respectively believed would impact the mediation and future case settlement. Finally, during September 17–18, 2020 the Parties engaged in a two-day formal mediation with Mr. Perry in Houston, Texas. Although the Parties did not resolve the pending

---

[5] http://www.pbmbllc.com/attorneys/john-w.-perry-jr/

matters during mediation, they continued to maintain further settlement discussions. On September 24, 2020, Mr. Perry provided a Mediator's Proposal to the Parties, which the Parties accepted on September 29, 2020—since that time the Parties have worked together diligently to craft the Agreement and its corresponding exhibits that are currently before this Court.

### III.
### SUMMARY OF SETTLEMENT TERMS

#### A.   INDIVIDUALS INCLUDED IN THE PROPOSED SETTLEMENT CLASS

The class is defined to include "all Persons who Reside[6] in the Class Area as of the date the Court enters the Preliminary Approval Order, or who formerly Resided within the Class Area for a period of at least one (1) month during the Class Period,[7] and had a legal right to occupy the Residence, through property ownership or residential lease agreement." *See* Exhibit 1, p. 5.  The Class Area is defined to include the geographic area within San Patricio County, TX, largely within the City of Portland and the City of Gregory as depicted and delineated in the map below.



---

[6] According to the Agreement, "Reside" means to occupy and/or own a Residence as a rightful property owner, or under a valid residential lease agreement, or as an authorized domiciled occupant for a period of at least one (1) month.  Reside shall not include any commercial or business occupant or occupancy. Exhibit 1, pg. 14.

[7] "Class Period" means the time that is between August 1, 2016 (the day Defendants began Operations) and the date the Court enters its Preliminary Approval Order.

*See* Exhibit D to Exhibit 1.[8] The Class Area is further subdivided into seven (7) Weighted Class Zones that take into account the degree of exposure to the Dust as it migrates from Defendants' La Quinta Plant.

Specifically excluded from the above defined class are: (a) any and all legal representatives, employees, corporate officers, heirs, successors, or assigns of Defendants; (b) the Judge to whom this matter is assigned, any member of the Judge's immediate family, and any other judicial officer who is or was assigned to this action; and (c) any attorneys who are employees, partners, members, or shareholders of Class Counsel. *See* Exhibit 1, § 3.1(a)–(c).

The scope of the Class Area was negotiated by the Parties both during mediation and while drafting the Agreement before the Court. In deciding upon the proposed Class Area and the seven (7) weighted zones within the Class Area, the Parties took into account the findings issued by the Texas Center for Environmental Quality ("TCEQ"), the testing and investigation performed by both Representative Plaintiffs' and Defendants' experts, and the prevailing weather patterns in the area.

## B.    TOTAL SETTLEMENT VALUE

The Total Settlement Value is $88,413,036.00 and includes both a monetary benefit (Total Cash Settlement Amount) and a non-monetary benefit (Remedial Measure Value) to the Class Members. *See* Exhibit 1, pgs 13, 16. The Total Cash Settlement Amount is $16,825,000.00. *See id.* at p. 16. The Remedial Measure Value includes "those past, present, and future improvements, modifications, and procedures that Defendants have taken, are taking, and/or will continue to take to minimize, mitigate or eliminate the migration of Dust from the Facility offsite, including to the Class Area" through December 31, 2023. *Id.* at p. 16.

The Remedial Measure Value is divided into two categories, and includes: (1) $50,740,967.00, for remedial actions taken from May 2017, and continuing through June 30, 2021; and (2) an additional

---

[8] Defendants' La Quinta Plant is depicted in green with the star.

$20,847,069.00 of continuing remedial actions that Defendants will take through December 31, 2023. Beginning in 2017, Defendants have undertaken and implemented a variety of improvements, modifications and procedures to mitigate or eliminate fugitive Dust in its operations and at its facility, and by extension, off-site. These changes include both the acquisition, installation and deployment of new equipment and changes in operational practices, including additional maintenance of equipment and monitoring of weather conditions. Defendants have also begun the implementation of multi-year capital projects involving new technologies that require performance of complicated engineering, procurement, and construction to incorporate these technologies at Defendants' La Quinta Plant. Several of these capital projects are on-going and will be completed over the next several years. Further, equipment purchased and incorporated into facility operations require upkeep and maintenance that will also continue into future years beyond 2023.

Remedial Measures instituted, acquired, installed, deployed and/or initiated since 2017 have included:

**Polymer Surfactant**: An eco-safe, biodegradable, liquid polymer, combined with a hydro-mulch and a color additive is sprayed on outdoor stockpiles of by-products, including HBI and iron oxide fines and chips, and Remet. Once applied, the surfactant creates a light surface crust that remains water permeable and is effective in controlling dust and suppressing fugitive emissions from the storage pile. The hydro-mulch additive is an additional binding agent to help the polymer to adhere to the stock piles. The color additive aides in identifying treated piles and in assessing the need for further application of the sprayed surfactant.

**Dust Bosses**: Powerful, portable dust-suppressing water cannons that have the capability of dispersing a water mist up to 1100 meters in elevation and covering an area of up to 31,000 square meters. Defendants have acquired eight units throughout the facility to assist in material handling operations. These are placed strategically at locations where materials are being transferred or moved, including to or from piles, and other locations. These cannons are routinely moved to high-work areas and are redirected as needed to knock down fugitive dust that may be generated by movement of materials and working in stockpiles.

**Paving and Curbing**: Defendants undertook a several-phased project to pave and curb roadways and other high-traffic areas throughout the facility that had not initially been paved and curbed in the original plant construction. Paving was focused on areas of high vehicle traffic, particularly heavy machinery traffic. Phase 1 included an

additional estimated 203,000 square feet of roads and surfaces throughout the facility. Phase 2 consisted of another estimated 88,000 square feet of roads and surfacing. Paving and curbing allows for much better control of dust from vehicle traffic through use of street sweepers and water trucks.

**Water Trucks**: Defendants acquired and deployed two Ford 150 Water Trucks (2000-2999 gallons). These are available and are utilized on a 24/7 basis. Initially, these were deployed principally on applying water on unpaved gravel road surfaces; later, as paving and curbing moved forward, deployment was transitioned principally to paved roads and surfaces as well as areas around by-products stockpiles throughout the facility.

**Street Sweepers**: Defendants acquired and deployed large street sweepers (TYMCO Model DST-6, Regenerative Air Sweepers) on a daily basis on paved road surfaces throughout the facility. These are available and are utilized on a 24/7 basis to address soils and other debris that get tracked onto road surfaces through movement of heavy machinery and other vehicle traffic.

**Conveyor Covers**: Defendants utilize conveyors to transport raw feedstock, final product and off-spec materials throughout the La Quinta Plant. The conveyor system is fitted with covers to minimize the impact of wind and rain on the materials being transported and to minimize fugitive dust emissions. Conveyor covers are routinely maintained and repaired. Additionally, the facility investigated, engineered and installed upgraded covers that are easier to remove and replace.

**Baghouses:** Defendants utilize baghouses to capture potential fugitive dust emissions from various transfer points along conveyors that move iron ore pellets used in the process areas. Baghouse compressors were upgraded to address local environmental conditions and to ensure increased reliability.

**Wind Breaks**: Temporary constructed wind breaks are installed and utilized in material handling areas and around transfer points throughout the facility, including at transfer towers and truck loading stations. These are used to shield material handling operations and to divert wind around such operations. They are often utilized in conjunction with Dust Bosses.

**Dry Fog**: This is a multi-phased, multi-year project to engineer, design and install a series of dry fog installations near material transfer areas where baghouses cannot be utilized and to capture potential black metallic dust from the movement of HBI product. The facility has consulted with Dust Solutions, Inc. (DSI) to install their unique Dry Fog product in several locations throughout the facility. Dry Fog is a manufactured fog made through air-atomizing nozzles that create water droplets between 1 and 10 microns in diameter. These droplets impact and agglomerate to fine airborne dust particles, making the dust particles heavy enough to fall back into the process and thus be removed from the air. To date, one project has been pilot tested and ultimately was completed and is in use, and another is soon to be completed. Several other projects are in engineering and/or planning stages, and still others are being investigated for engineering feasibility.

**Perimeter Wind Fence**: After a detailed engineering feasibility investigation and computer modeling exercises, Defendants are in the process of constructing a unique 70-foot Wind Fence in an "L" configuration along a large portion of the eastern facility boundary and extending westward along the southern boundary of the main facility processing area. The Wind Fence is an engineered and site-specific installation, utilizing a unique mesh fencing material sold by DSI that, as designed, is intended to reduce wind velocities downwind of the fence location. This installation is geared to address winds from the south and east, the majority wind directions at the La Quinta Plant. The project underwent computerized wind modeling to determine optimal sizing (height) and location placement (ground orientation and length) of the Wind Fence to best optimize wind reduction in operating areas within the facility.

*See* Exhibit H to Exhibit 1. In addition to the specific actions and projects identified above, Defendants have also retained consultants to address the possibility of future feasible dust mitigation projects upon the completion of the current capital projects. Defendants have also begun construction on the By-Products Management Improvements Project, a new multi-year capital project intended to implement better methods to separate, store, handle and re-use by-products (such as oxide fines and chips, and Remet) and lump ore used in the production of HBI. The By-Products Management Improvements Project reduces the Dust by causing a reduction in the volume of by-product material in stockpiles. Eventually, the By-Products Management Improvements Project will lead to the elimination, over time, of stockpiles. The project was engineered and designed to minimize dust generation from movement of these materials from stockpiles to the processing tower, and to reduce front-end loader traffic and open movement of stored materials. Some of the design features include cladded transfer towers with dust collection systems, covered conveyors, enclosed screening stations (one for handling oxides and another for handling lump ore and Remet), and new storage locations each partially surrounded with three concrete walls and a roof. *See id.*

A breakdown of expenses is included below:

| Project | Costs through June 30, 2021 | Estimated Costs through 2023 |
|---|---|---|
| Polymer Surfactant | $894,659[i] | $392,900* |
| Dust Bosses | $2,312,747[ii] | $599,125* |
| Paving/Curbing | $3,611,064 | none currently planned |
| Water Trucks | $392,725[iii] | $254,250* |
| Street Sweepers | $2,172,870[iv] | $989,500* |
| Conveyor Covers | $20,211 | TBD |
| Baghouses | $64,089 | TBD |
| Wind Breaks | $286,034[v] | $180,000* |
| Dry Fog | $1,469,817 | $2,457,155 |
| Perimeter Wind Fence | $4,650,411 | $3,244,589 |
| Consulting | $75,890 | TBD |
| By-Products Management | $34,790,450 | $12,729,550 |
| | | |
| TOTAL | $50,740,967 | $20,847,069 |

TOTAL -- All Remedial Measures anticipated through 2023: $71,588,036

*See id.* at pgs. 3–4 (internal footnotes are not reproduced here). The costs associated with these Remedial Measures are significant. As previously noted, additional upkeep and maintenance costs, operating costs associated with these projects, and costs associated with investigating and possibly implementing new installations and other dust mitigation measures, will continue in the years beyond 2023.

## C.    SCOPE OF APPLICABLE RELEASE

The Released Parties means the Defendants voestalpine USA Holding LLC f/k/a voestalpine Texas Holding LLC, voestalpine Texas Holding LLC and voestalpine Texas LLC, and each of their past, present and future members, officers, directors, shareholders, employees, joint venturers, managers, representatives, adjusters, attorneys, agents, consultants, insurers, excess insurers, reinsurers, indemnitors, contractors, affiliates, divisions, partnerships, independent contractors, parents, subsidiaries, related entities, predecessors, successors, assigns, and including but not limited to, successors or predecessors by merger, and any other person or entity acting on their behalf or who has, had or could have any legal responsibility relating to the Released Claims. *See* Exhibit 1, pg. 13.

The Released Claims under this Agreement include any and all claims, demands, actions, causes of action, whether individual actions and/or class actions, seeking damages or relief of any nature or kind, past, present and future, including those that that have occurred, that currently exist, that are of a continuing and ongoing nature, and/or which may arise in the future, including but not limited to claims for compensatory damages, punitive or exemplary damages, costs, pre-judgment interest, post-judgment interest, attorney fees, damages, obligations, liabilities, appeals, reimbursements, replacement costs, expenses, liens, interest, penalties or fines, and including claims which were asserted or which could have been asserted in the Consolidated Action based on the facts alleged in the Consolidated Action, accrued or not yet accrued, legal or equitable, under any theory, at law or equity, including specifically, but not limited to all claims of past or present nuisance, continuing nuisance, permanent and/or temporary nuisance, and/or trespass, and/or other claims of fault, including negligence, gross negligence, ultra-hazardous liability, strict liability, vicarious liability, related to Dust (but excluding claims for personal injury); as well as, claims based on environmental laws and/or regulations, including the federal Clean Air Act, and all other federal, state, county, city or local statutes, rules, regulations and ordinance of every kind and nature, seeking relief based on facts or events that have occurred, and/or that currently exist, and/or that are of a continuing and ongoing nature, and/or which may arise in the future, related to Dust; as well as, claims related to Dust arising out of, caused or contributed by or relating to the siting, construction, existence of or operation of the Facility from the time of construction and from the start-up of the Facility, whether before, on, or after the Effective Date of this Agreement and continuing hereafter; and as well as, any injunctive relief seeking protection from or to prevent, reduce, mitigate or eliminate, Dust; all of which claims and causes of action Releasing Parties expressly waive and relinquish to the fullest extent permitted by law. Such Released Claims specifically include, but are not limited to, claims seeking or asserting:

1. Damages, past, present and/or future for damage or injury to Personal Property of any kind or nature, including cleaning, repair, replacement or restoration costs or expenses;

2. Damages, past, present and/or future for damage or injury to Real Property, including cleaning, repair, replacement or restoration costs or expenses;

3. Damages, past, present and/or future for damage or injury to Vehicles, including cleaning, repair, replacement or restoration costs or expenses;

4. Damages, past, present and/or future for loss of use and enjoyment of Real Property or Personal Property;

5. Damages, past, present and/or future for inconvenience;

6. Damages, past, present and/or future for emotional distress, or fear or fright;

7. Damages, past, present and/or future for diminution of value of Real Property or Personal Property, or for "stigma" damages;

8. Damages, past, present and/or future for temporary or permanent nuisance, private nuisance or inconvenience, negligence, negligence per se, trespass, or gross negligence, including of a continuing nature;

9. Exemplary or punitive damages;

10. Equitable or injunctive relief;

11. Damages, past, present and/or future for business interruption loss, loss of business opportunity, loss or profits, loss of rents, loss of income and/or other economic loss relating to any commercial conduct performed at or relating to a Residence within the Class Area (including but not limited to commercial conduct while working from the Residence during the COVID-19 pandemic);

12. Expenses for investigation, engineering services, cleanup, restoration, response or removal actions, or remediation with respect to Personal Property or Real Property, or for Vehicles;

13. Any private attorney general enforcement actions or "citizen suits" and/or any other private cause of action under any federal and/or state statute, pending or threatened, past, present and/or future, with respect to Dust, including but not limited to claims for damages, penalties, fines, injunctive or equitable relief, investigation, remediation, monitoring, testing, cleanup, remedial action, removal actions, remedial costs and/or restoration;

14. Violation of any federal, state or local statute, law, ordinance, order or regulation.

It is expressly understood that Released Claims include claims related to Dust that have not yet occurred but which may arise in the future, **provided, however**, that Released Claims do not include, and that nothing herein shall bar, any claims for relief based solely on the incremental emissions or releases of Dust from future Facility operations that exceed 100 percent of the currently permitted maximum annual production capacity (as referenced in the air emission permits NSR Permit No. 108113 and PSDTX1344M1, issued by the Texas Commission on Environmental Quality to voestalpine Texas LLC, and applications related thereto); and, **further provided**, that Released Claims do not include, and that nothing herein shall bar any claims for relief based solely on a future catastrophic release from the Facility (i.e., an unexpected, accidental incident resulting in releases of Dust atypical in nature and dramatically greater in amount than those historically associated with regular plant operations), which causes substantial real or personal property damages that are significant and measurable to a Plaintiff or Class Member seeking such relief. *See* Exhibit 1, § V.

## D.    SETTLEMENT ADMINISTRATION PROCESS

To aid in the administration of the settlement, pending approval by this Court, the Parties have agreed to utilize the services of Dan Balhoff, a law partner of mediator John W. Perry, Jr.,  as Special Master (including members of his law firm, Perry, Balhoff, Mengis & Burns, LLC, to whom he may delegate tasks) in the effectuation of this Agreement. Mr. Balhoff, as the Special Master, shall be responsible for overseeing the settlement administration process, from the issuance of notice through the allocation of the settlement proceeds. The Parties have also selected Postlethwaite & Netterville of Baton Rouge, Louisiana to serve as the Claims Administrator under the direction and oversight of the Special Master. The Claims Administrator may contract with various third-party companies to effectively fulfill its duties as the Claims Administrator.

1.      **Class Member Identification Plan**

In order to ensure that notice of this settlement reaches the Class Members, the Claims Administrator shall, subject to Court-approval, implement the Property Identification Plan ("PIP") outlined in the Agreement. *See* Exhibit 1, at Exhibit G. The PIP describes the efforts to be undertaken by the Claims Administrator to (a) identify the physical addresses of all Residences in the Class Area; (b) attempt to locate the addresses for Persons who own the Residences, if they do not reside at the Residence; and (c) attempt to locate individuals who no longer reside at and/or previously owned a Residence within the Class Area during the Class Period.

To do this, the Claims Administrator will engage a vendor with the applicable working knowledge of geospatial data to utilize the "shapefiles" made publicly available by the San Patricio County Appraisal District. These shapefiles will allow them to identify the properties located within the seven (7) Weighted Class Zones within the Class Area. The data available within these files includes: Parcel ID, Site Address, Owner Name, and Owner Mailing Address. This data is available for each appraisal year from 2016 through 2021. Using that data output, the Claims Administrator will aggregate a list of *all* properties identified within the Class Area for each year of the Class Period (the "Property Database"). For each residential property within the Property Database, the Claims Administrator will identify all Owners (and their respective mailing addresses) within the Class Period, according to the San Patricio County Appraisal District records.[9]

Additionally, the Claims Administrator will obtain from CoreLogic (a data and analytics leader within the housing and insurance industries) a list of all properties with complete mailing addresses within zip codes 78359 (Gregory, TX) and 78374 (Portland, TX) where the property type is identified as "Residential." This data will be used to cross reference and reasonably filter the Property Database

---

[9] The Claims Administrator may utilize skip-tracing as needed to update mailing address information for non-Resident Owners within the Property Database.

records to include only Residences and remove records associated with other property types (such as Vacant Land, Agricultural, Industrial, Commercial, Recreational, Public, etc.) which may be included in the county appraiser data set. Finally, the Claims Administrator will obtain a list of all multi-family dwelling (apartment) addresses within zip codes 78359 (Gregory, TX) and 78374 (Portland, TX) to add to the Property Database from Alesco Data, a consumer and resident data provider. The Claims Administrator may also utilize tools available through the United States Postal Service, such as the National Change of Address ("NCOA") Database to "pre-screen" the Property Database records for mail deliverability and adjust its records accordingly.

### 2. Notice Distribution Plan

The Parties have created a detailed a comprehensive Notice Plan[10] to provide comprehensive notice of the settlement to the Class Members. *See* Exhibit I to Exhibit 1. Specifically, the Notice Plan contemplates having three methods of notice distribution: (1) direct First-Class U. S. Mail to the addresses identified in the Property Database; (2) a comprehensive settlement website; and (3) Newspaper Notice to run in one or more newspapers of wide distribution that include Portland, Texas and Gregory, Texas.

Within sixty (60) days of an order preliminarily approving the settlement, the Claims Administrator will send individual Notice Packets to each Class Member/Residence identified in the Property Database ("Notice Issuance Deadline"). These Notice Packets will contain the Short-Form Class Notice (Exhibit A to Exhibit 1), Claim Form (Exhibit C to Exhibit 1), and a pre-paid return envelope. The Short-Form Class Notice consists of approximately one page and provides: an overview of the settlement process with instructions for how to participate, object, or opt out; how to obtain additional information; and the date and time of the fairness hearing.

---

[10] The full Notice Plan out outlined in Exhibit I to Exhibit 1.

The Short-Form Class Notice also directs Class Members to the settlement website where they may access the Long-Form Class Notice (Exhibit B to Exhibit 1). The Long-Form Class Notice provides more comprehensive information about the lawsuit(s) and the settlement, and details the process for submitting a Claim Form, objecting to the settlement, or opting out of the Class. In addition to the Long-Form Class Notice, the settlement website will also have available the relevant case documents, including: downloadable Claim Forms, the live pleading in the Consolidated Action, the Agreement, this Motion, and the Order granting preliminary approval.

The Claims Administrator will set up a settlement call center where Class Members may call to obtain additional information about the Settlement and ask questions about submitting a Claim Form, objecting, or opting out of the settlement. Depending on the nature of the questions asked, the Claims Administrator may direct the Class Member to the Special Master for further discussions. The contact information for the call center will be included in both the Short-Form and Long Form Notices and will be prominently placed on the settlement website. The Claims Administrator will also provide an email address the Class Members may use to communicate and provide documentation.

In addition to the individuals/residences identified in the Property Database, the Parties also intend to circulate a Newspaper Notice through the Corpus Christi Caller Times, a local newspaper with distribution across the Corpus Christi, Texas and Gregory/Portland, Texas area. This Newspaper Notice will contain substantially the same information as is contained in the Short-Form Notice and is principally (but not exclusively) intended for *former* Residents who are not likely to have been identified in the Property Database to receive the Notice Packet via mail. The Claims Administrator will arrange for the Newspaper Notice to be published in the Corpus Christi Caller Times beginning on the Notice Issuance Deadline and bi-weekly thereafter during the Notice Period. The Newspaper Notice will include information on how a Resident who believes he or she may qualify as Class Member can obtain a Notice Packet and file a Claims Form in order to qualify as a Participating Class

Member.  Included in the Newspaper Notice will be the Settlement website address and the phone number for the Settlement call center.

### 3.      Notice Period

The Notice Period shall run sixty (60) days from the Notice Issuance Deadline. *See* Exhibit 1, pg. 8. During the Notice Period, Class Members may return their Claim Form (and any required supporting documentation) to the Claims Administrator to become a Participating Settlement Member and receive monetary compensation ("Settlement Sum") out of the Net Settlement Fund. Likewise, a Class Member may object to the terms of the settlement or opt-out of the settlement during the Notice Period.

a.      Procedure to Return Claim Form and Documentation.

In order for a Class Member to become a Participating Class Member and be eligible to receive a Settlement Sum, they must properly and timely complete and submit a Claim Form.  The completed Claim Form (and any necessary documentation) must be postmarked or otherwise received by the Claims Administrator by the end of the Notice Period. The Claim Form must: (1) be signed by the Class Member;  (2) identify whether the Class Member (i) owns/owned but does/did not occupy the Residence, (ii) owns/owned and occupies/occupied the Residence, or (ii) Resides in the Residence by virtue of a residential lease; (3) state the dates during the Class Period that the Class Member owned and/or Resided in the Residence; and (4) state their email address and telephone number to aid future communication.  In the event of a non-marital co-tenancy, each such Resident must provide the requested information on individual Claim Forms.

Class Members must also submit a Proof of Residence.  Proof of Residence may consist of: a utility bill showing the Class Member's name, the residential address, and a date within the Class Period; a lease agreement identifying Class Member and the property address at issue with the term of the lease; a letter from a property owner or leasing agent acknowledging the address and dates of

occupancy and identifying the Class Member as the tenant or an individual with a right to reside at the residence; a driver's license or state identification card issued by the State of Texas showing the Class Member's name and address; or any other such documentation that may be accepted by the Settlement Master at his discretion.

Upon receipt of each Claim Form, the Claims Administrator shall verify that it is completely filled out and timely received. In the event a Claim Form contains inaccurate or conflicting information on its face or is otherwise incomplete, the Claims Administrator shall contact the Class Member to obtain the required information or otherwise correct the Claim Form. The Claims Administrator will then compile all Claims Forms into the Claim Form Database. The Claim Form Database will be organized by zone and will identify all Claim Forms received per Residence within the Class Area.

      b.      Procedure to object to, or opt-out of, the settlement.

Each Class Member wishing to object to the settlement shall file with the Claim Administrator a timely written notice of objection delivered or postmarked during the Notice Period. *See* Exhibit 1, § 3.4. The objection must contain the following information to be valid: (1) the name and cause number of the Consolidated Action; (2) the Class Member's name, address, and telephone number; (3) the factual basis for the claim of qualifying for the status of class membership, including whether the objector is a current or former Resident of a property in the Class Area, and for what period of time during the Class Period, and including Proof of Residence or proof of ownership of Real Property within the Class Area; (4) state whether the Class Member plans to appear, either individually or through an attorney at the Fairness Hearing; (5) each specific objection or objections to the Settlement with the complete factual basis for each such objection, along with whatever legal authority, if any, the objector asserts regarding the objection; (6) a statement advising if the Class Member has objected to other class action settlements, and if so, identifying each such settlement, the date of such objection and the basis for the objection; and (7) their Personal Signature on the form under penalty of perjury

in the presence of at least one adult witness. No "mass" or "class" Objections shall be valid, and each Class Member who wishes to object must file their own objection that satisfies the above requirements. Failure of the Objector to comply with each of the above requirements for the Objection or to properly and timely serve copies on all the parties listed above will invalidate the objection. Additionally, Class Members who fail to file and serve timely written objections in accordance with these provisions shall be deemed to have waived any objections, shall not be heard at the Fairness Hearing, and shall be foreclosed from making any objection (whether by appeal or otherwise) to the settlement.

Each Class Member who does not file an objection to the Settlement may exclude themselves from the Settlement by filing a timely written opt-out request with the Claims Administrator. *See* Exhibit 1, § 3.5. To be timely, the opt-out request must be delivered or postmarked within the Notice Period. The written opt-out request out must state or include the following to be valid: (1) the name and cause number of the Consolidated Action; (2) the Class Member's name, address, and telephone number; (3) a clear statement that the Class Member desires to opt out of the Settlement; (4) a clear statement explaining the reason or reasons why the Class Member is choosing to opt out of the Settlement; (5) whether the Class Member has or intends to retain legal counsel to represent him or her further, and whether the Class Member has or intends to file a lawsuit against Defendants; and (6) include their Personal Signature on the form under penalty of perjury in the presence of at least one adult witness. No "mass" or "class" opt-out requests shall be valid, and no Class Member may submit an opt-out request on behalf of any other Class Member.

The Claims Administrator will serve any objection or opt-out request on Class Counsel within fifteen (15) days of the close of the Notice Period, and Class Counsel shall file any such documents with the Court within twenty (20) days of the close of the Notice Period. The Claims Administrator shall collect and tabulate all opt out notices and all objections and report to Class Counsel and

Defendants' Counsel at least weekly identifying each opt out person and each objector along with information identifying the location and zone of each such opt out or objector. The Special Master may, at his sole discretion, contact any individual who submits a written objection or opt-out request to further ascertain the rational for the objection or opt-out request and to answer any questions about this Agreement.

4. **Allocation Method for Distribution of Net Settlement Amount**

After the close of the Notice Period, the Claims Administrator shall provide the Special Master with the Claim Form Database. The Special Master shall thereafter have full and final authority to determine the amount to be paid to each Class Member who timely submitted a valid Claim Form according to the provisions below. *See* Exhibit 1, § IV.

Each Residence in the Class Area for which one or more Claim Forms is received shall be considered one (1) Residential Unit for purposes of administering the Settlement Agreement. The Special Master shall review the Claim Forms submitted during the Class Period for the purpose of determining the total number of Residential Units and setting the Weighted Zone Value. The Special Master has the discretion to set the Weighted Zone Value within the parameters set in the Settlement Agreement, such that the Residential Unit Value, when multiplied by the respective Weighted Zone Value for each Residential Unit equals the Net Settlement Amount. In establishing the Weighted Zone Value, the Special Master should consider the respective exposure to Dust based on proximity to the Facility, dominant weather patterns, and other factors to be discussed in consultations with Class Counsel and Counsel for Defendants. The Residential Unit Value shall be separated into two amounts: (1) an amount for damages to Real Property ("Real Property Amount"); and (2) an amount for damages to Personal Property ("Personal Property Amount").

In the event multiple Participating Class Members return Claim Forms for the same Residence, those Participating Class Members shall each receive a divided share of the Residential Unit Value.

The Special Master shall have full discretion in proportioning the Residential Unit Values between Participating Class Members who may have resided at the same residence during the Class Period and may consider factors such as the status as an Owner and/or Tenant, the duration of time and period of time within the Class Period that each owned and/or rented the Residence, and other factors at his discretion.

Within ninety (90) days of the close of the Notice Period, the Special Master shall set the Weighted Zone Values and apportion the Net Settlement Amount to reflect his determination of each Participating Class Member's individual Settlement Sum according to the Agreement. This apportionment shall be referred to as the Settlement Distribution Plan and it shall be filed with this Court in advance of the Fairness Hearing.

## E.     Attorneys' Fees

Pursuant to Federal Rule of Civil Procedure 23(h), Class Counsel will file a motion for an award of attorneys' fees and litigation expenses. By that motion, Class Counsel will request an amount that does not exceed 7.63% of the Total Settlement Value. The motion for fees and expenses shall be filed contemporaneously with the Motion for Final Approval, or by the deadline set by this Court.

## F.     Service Awards

Class Counsel shall likewise seek service awards, subject to Court Approval, for the Representative Plaintiffs named herein. Class Counsel will recommend a service award of $1,000.00 for each Representative Plaintiff, for a total service award amount of $7,000.00.

## IV.
## ARGUMENT & AUTHORITIES

### A.     JUDICIAL POLICY FAVORS PRE-TRIAL SETTLEMENT OF CLASS ACTION LAWSUITS

Federal Rule of Civil Procedure 23(e) requires court approval for any compromise of a class action. *Evans v. Jeff D.*, 475 U.S. 717, 727–28 (1986) ; *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) . In determining whether to approve a settlement, the Court should be guided by the

strong judicial policy favoring pretrial settlement of complex class action lawsuits. *See, e.g., Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ; *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007). This is, in part, because of the complexity and size of class actions:

> Particularly in class action suits, there is an overriding public interest in favor of settlement . . . . It is common knowledge that class suits have a well deserved reputation as being most complex. The requirement that counsel for the class be experienced attests to the complexity of the class action . . . . In these days of increasing congestion within the federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources.

*Cotton*, 559 F.2d at 1331 (citing *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826 (5th Cir. 1975)); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (recognizing courts are mindful of the "strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement.").

Courts should "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *Gunnells v. Health Plan Services, Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) cert. den., *Healthplan Services, Inc. v. Gunnells*, 542 U.S. 915 (2004) (citing *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989), cert. den., 493 U.S. 959 (1989)); *see also Kidwell v. Transportation Communications International Union*, 946 F.2d 283, 305 (4th Cir. 1991), cert. den., 503 U.S. 1005 (1992) ("[t]rend is to give Rule 23 a liberal construction."); *Rodger v. Electronic Data Systems Corp*, 160 F.R.D. 532, 535 (E.D.N.C. 1995).

**B.** **STANDARD FOR PRELIMINARY APPROVAL OF THE CLASS SETTLEMENT**

When a settlement is reached prior to Rule 23 certification, the law permits a class to be certified solely for the purposes of settlement. FED. R. CIV. P. 23(e); *Gonzalez v. O.J. Smith Farms, Inc.*, No. 5:20-CV-00086-FL, 2020 WL 7388435, at *2 (E.D.N.C. Dec. 16, 2020). Although Rule 23(e) does

not delineate a procedure for court approval of settlements of class actions, courts have generally followed a multi-step process. *See* FED. R. CIV. P. 23(e)(2).

There are typically three stages applicable to the review of a proposed class action settlement. *See* MANUAL FOR COMPLEX LITIGATION (4th) § 21.632–.634 (4th ed. 2004). First, the court conducts a preliminary fairness evaluation and, if applicable, considers class certification. *See id.* at § 21.632 (noting that if the parties move for both class certification and preliminary approval, the certification hearing and preliminary fairness evaluation can usually be combined). Second, if the court makes a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms, the parties are directed to prepare the notice of certification and proposed settlement to the class members. *Id.* at § 21.633. Third, the court holds a final fairness hearing to determine whether to approve the settlement. *Id.* at § 21.634 .

At the preliminary approval stage, courts must both ensure that all of the requirements of Rule 23(a) and one of the sections of 23(b) are satisfied and determine that the settlement falls within the range of possible approval. *See* FED. R. CIV. P. 23(a)–(b); *Winingear v. City of Norfolk*, No. 2:12CV560, 2014 WL 12526327, at *1 (E.D. Va. June 5, 2014). Federal courts generally find that preliminary approval of settlement and notice to the proposed class is appropriate if the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." NEWBERG ON CLASS ACTIONS § 13:13 (5th ed. 2011). Preliminary approval requires an exacting and thorough examination of the settlement at issue, not merely a "judicial rubber-stamp" of the parties' agreement. *Id.* The Court must be provided with the necessary information "to evaluate the fairness or adequacy of a proposed settlement." *Id.* (citing *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 383–84 (D. Minn. 2013)).

For preliminary approval, "the standards are not as stringent as those applied to a motion for final approval. *See In re OCA, Inc. Secs & Derivative Litig.*, Civ. A. No. 5-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008); *see also Manual for Complex Litigation*, § 21.63 ("At the stage of preliminary approval, the questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final review."). On a motion for preliminary approval, courts consider the following factors: whether the settlement (1) discloses any reason to doubt its fairness, (2) has any obvious deficiencies, (3) proposes to grant preferential treatment to class representatives or segments of the class, (4) proposes excessive compensation to attorneys, and (5) appears to fall within the range of possible approval. *See OCA, Inc.*, 2008 WL 4681369, at *11.

## C.     THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

Although this Court will make its final determination that the settlement is fair, reasonable, and adequate after the Fairness Hearing (should the agreement be preliminarily approved), it is required to evaluate the settlement at issue to ensure that it is appropriate to move to the next step—notice to the Class Members. The Agreement contains the material economic terms of the Settlement, the manner of notice to be given to the Class, the contingencies or conditions to the Settlement's final approval, and other terms. Accordingly, Plaintiffs will show that the Agreement at issue satisfies all fairness concerns such that preliminary approval is appropriate.

### 1.     There Is No Reason to Doubt the Fairness of the Settlement

Class Counsel—experienced complex action litigators accustomed to resolving claims on class action bases across the United States—are convinced that this settlement is fair and reasonable. *See Declaration of Austin Anderson, attached as Exhibit 2; and Declaration of Kevin Liles, attached as Exhibit 3. The extensive settlement negotiations were conducted fairly and at arm's-length with the assistance of John W. Perry, Jr., a nationally-renowned mediator, and only after engaging in extensive discovery and motion practice. *C.f., Mangone v. First USA Bank*, 206 F.R.D. 222, 226 (S.D. Ill. 2001)

(recognizing that arm's-length negotiations conducted by competent counsel constitute *prima facie* evidence of a fair settlement); *Bert v. AK Steel Corp.*, No. 1:02-CV-467, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008) ("The participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties."). Indeed, the Parties worked with Mr. Perry, both together and separately, for over a year before participating in formal mediation. Moreover, both Parties' counsel support the Agreement as fair and reasonable, and all certify that it was reached at arm's length.

Courts often note that a proposed settlement reached through arms-length negotiations is entitled to a judicial presumption of fairness. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007) ("[T]here is a strong presumption in favor of finding the settlement fair, adequate and reasonable.") (collecting cases); *see also Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 650 (N.D. Tex. 2010), as modified (June 14, 2010), judgment entered (June 18, 2010), enforcement denied, No. 7:03-CV-102-D, 2011 WL 2413318 (N.D. Tex. June 15, 2011) ("[C]ourts are to adhere to a strong presumption that an arms-length class action settlement is fair—especially when doing so will result in significant economies of judicial resources—absent evidence weighing against approval.").

### 2. There Are No Deficiencies in the Settlement

The Agreement at issue fully complies with the requirements of Federal Rule of Civil Procedure 23. The Parties have negotiated a reasonable settlement and created a program to provide notice of the settlement to the class members that complies with Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure. The Rule 23 Class Members identifiable in the Property Database will receive the Notice Packet in a hard copy via regular mail. Included with the Short-Form Class Notice will be a Claim Form they can elect to return in the included pre-paid return envelope to participate in the settlement. The Notice Packet will also direct the Class Members to the settlement website where they can download additional Claim Forms, review the Long-Form Class Notice, the Agreement, the

live pleading, and this Motion. The Parties have also arranged for the dissemination of Newspaper Notice through the Corpus Christi Call Times—a newspaper of general dissemination throughout the Class Area.

The settlement provides ample time and reasonable procedures for class members to exclude themselves from the settlement or to object to the settlement if they choose to do so. Specifically, the deadline for the Class Members to return their Claim Forms and supporting documentation, written objections, or requests to opt-out, is sixty (60) days from the date the Claims Administrator mails the notice. In short, this is an arms-length settlement achieved at mediation and by attorneys who are, on both sides, experienced in class action litigation. The settlement terms and the process for approval are designed to avoid "obvious deficiencies," and the Plaintiffs respectfully submit that there are no deficiencies in this settlement.

### 3. The Settlement Does Not Improperly Grant Preferential Treatment to Representative Plaintiffs or any Segment of the Class

The settlement does not improperly grant preferential treatment to any Class Members or any segment of the class. While there are no sub-classes at issue the Class Area itself is divided into seven (7) Weighted Class Zones. The purpose of these zones, however, is to ensure that the Agreement is applied fairly to the Class Members—it recognizes that all Class Members in the Class Area are not equally affected by the migration of the Dust. Instead, certain areas that are both closer in proximity and/or otherwise regularly downwind of Defendants' La Quinta Plant are exposed to a greater amount of Dust. The zones at issue were not created arbitrarily, but instead were based on the extensive work performed by the retained experts—both Plaintiffs' and Defendants'. Moreover, it will be the Special Master who is ultimately responsible for reviewing the Claim Forms, setting the Weighted Zone Values, and assigning each Participating Class Member's Individual Settlement Sum. This removes any potential for bias or unfairness in the settlement distribution.

The Parties have also agreed to provide small service awards to the seven (7) Representative Plaintiffs. These awards will come, if at all, only by motion to this Court after notice to the other class members is provided, as contemplated by the Agreement. Federal courts consistently approve service/enhancement awards in class/collective action lawsuits to compensate the named plaintiffs for the services that they provide and the burdens that they shoulder during litigation. *See, e.g., DeHoyos*, 240 F.R.D. at 340 (collecting cases). The total sum of the enhancement awards requested herein does not exceed $7,000.00, to be paid from the settlement fund. This modest request compares favorably to other service awards in the Fifth Circuit. *See, e.g., King v. United SA Fed. Credit Union*, 5:09-cv-00937-NSN, ECF No. 31 (W.D. Tex. Oct. 8, 2010) (awarding $15,000 to each of the two class representatives).

4.      **The Agreement Does Not Excessively Compensate Class Counsel**

The reasonableness of attorneys' fees will be decided by this Court after Class Counsel files a separate motion for attorneys' fees and expenses. By that motion, Class Counsel will request no more than 7.63% of the Total Settlement Value as compensation for their fees, in addition to their incurred litigation expenses. It is not unusual for courts in the Fifth Circuit to award percentages of approximately 40% of the common fund. *See Wolfe v. Anchor Drilling Fluids USA Inc.*, No. 4:15-cv-1344, 2015 WL 12778393, *3 (S.D. Tex. Dec. 7, 2015) (awarding 40%).

5.      **The Settlement is Within the Range of Reasonableness**

The settlement is well within the range of reasonableness. The value achieved in this litigation is extraordinary—in addition to the Total Cash Settlement Amount of $16,825,000.00, every Class Member has benefited (and will continue to benefit) from the remedial measures that Defendants have undertaken to reduce the migration of Dust from their La Quinta Plant.  Indeed, since this litigation was filed in May of 2017, Defendants have incurred $50,740,967.00 in expenses through June 30, 2021, working to reduce (if not eliminate) the Dust from their facility.  As discussed above,

those remedial measures have been extensive and involve modifications from simple construction projects and the implementation of wind breaks, to significant investment in capital expenditures. Defendants have also committed to continuing their remediation efforts and have pledged to complete the cited projects, which are estimated to cost $20,847,069.00 from July 1, 2021 through December 31, 2023, and additional costs beyond then. These remediation efforts benefitted and enriched the Class as a whole and have significantly lessened (if not wholly eradicated) the initially complained of harm.

In addition to the remedial benefits conveyed by Defendants, the Participating Class Members will also receive a cash award, their Individual Settlement Sum, for their damages. Because the amount of each Class Member's Individual Settlement Sum can only be determined after the close of the Notice Period, and after the Special Master sets the Weighted Zone Values and makes his decisions regarding disbursement, it is difficult to calculate the monetary amount each Class Member may obtain. However, Plaintiffs believe that the Participating Class Members will receive a significant Settlement Sum for damages that were ultimately determined to be substantially related to the value of enhanced cleaning measures.[11] *See* Exhibit 2, ¶ 20; and Exhibit 3, ¶ 11.

Moreover, it is uncertain that the Class Members would be entitled to legally recover for their alleged damages should they proceed to trial on the merits. Because of the nature of the claims at issue, Class Members would face significant legal hurdles establishing their entitlement to any recovery, at all. *See id.* If the litigation were to continue, the Class Members would face significant risk that could limit—or eliminate—their claims, including the denial of Rule 23 class certification, and dispositive motions on liability. Despite these real and significant risks, the Participating Class Members will

---

[11] While Plaintiffs initially believed that the Dust was causing permanent damage to their real and personal property, through the course of discovery they determined that the damage was (and is) remediated with enhanced cleaning, and was not in fact causing lasting harm.

receive meaningful compensation based on their location in relationship to Defendants' La Quinta Plant.

Weighing the risks against the benefits of a settlement, the Agreement is fair and reasonable.

## D.     The Class Certification Requirements of Rule 23 Are Satisfied

Plaintiffs seek class certification under Rule 23(b)(3), and the certification requirements of Rule 23 generally apply even when certification is for settlement purposes. *See Amchem Prods. Inc.*, 521 U.S. 591 ; *see also* FED. R. CIV. P. 23(b)(3). The one exception is that, because no trial is contemplated, the court need not consider "whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Id.* at 620; *accord In re Heartland Payment Sys.*, 851 F. Supp. 2d 1040, 1058–60 (S.D. Tex. 2012). The party seeking certification bears the burden of establishing these requirements by a preponderance of the evidence. *Id.* at 1052.

To be certified, the class must first satisfy the four threshold requirements of Rule 23(a), which provide that:

(1)      the class is so numerous that joinder of all members is impracticable;

(2)      there are questions of law or fact common to the class;

(3)      the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)      the representative parties will fairly and adequately protect the interests of the class.

*See* FED. R. CIV. P. 23(a).

If the prerequisites of Rule 23(a) are met, a proposed class seeking damages must also satisfy the requirement of Rule 23(b)(3). Rule 23(b)(3) requires the district court to make a finding that (1) questions of law or fact common to class members predominate over questions affecting only individual members, and (2) that a class action is superior to the other methods for fairly and efficiently adjudicating the controversy. *See id.* at 23(b)(3).

### 1. The Proposed Class Satisfies the Rule 23(a) Factors

To be certified as a class action, the proposed class must first satisfy all four threshold conditions of Rule 23(a)—namely, that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class"—conditions commonly known as "numerosity, commonality, typicality, and adequacy of representation." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020) (internal citations omitted) (quoting FED. R. CIV. P. 23(a)). Plaintiffs will address each in turn.

#### a. Numerosity

To satisfy Rule 23(a)(1)'s numerosity requirement, Plaintiffs must put forward evidence showing that the number of class members is so large that joinder is impracticable. FED. R. CIV. P. 23(a)(1); *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at *5 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019). Plaintiffs seek to certify a class composed of: "all Persons who Reside in the Class Area as of the date the Court enters the Preliminary Approval Order, or who formerly Resided within the Class Area for a period of at least one (1) month during the Class Period, and had a legal right to occupy the Residence, through property ownership or residential lease agreement." The Plaintiffs have provided a map of the Class Area that details the neighborhoods included in the Class. While the precise number of Class Members is not yet known, it is certain that the class will include several thousand Class Members. *See* Exhibit D to Exhibit 1.

While no definite standard has been established as to what size class satisfies the numerosity requirement, classes consisting of 100 to 150 class members have been found to be within the "range that generally satisfies the numerosity requirement." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620,

624 (5th Cir. 1999). Recognizing that minimum standards are not applicable, classes much smaller than Plaintiffs' proposed class have been found sufficient. *See Silva–Arriaga v. Tex. Express*, Inc., 222 F.R.D. 684, 688–89 (M.D. Fla. 2004) (finding numerosity based on the extreme burden of joining over 200 migrant lemon pickers); *McMiller v. Bird & Son, Inc.*, 68 F.R.D. 339, 341 (W.D. La. 1975) (finding that joinder of 121 class members would be impracticable). Accordingly, Plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement.

### b.  Commonality

Rule 23(a)(2) requires that the class members' claims depend on a common issue of law or fact whose resolution "will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke."[12] *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). To satisfy the commonality requirement, a plaintiff should "specifically delineate how a class proceeding would allow the court to resolve a discrete question of law [or fact] whose determination will resolve an issue that is central to the validity of each of the [individual plaintiff's] claims in one stroke." *Id.* (quoting *Wal-Mart*, 564 U.S. at 2545 (internal quotations omitted")).

Here, the Class Members easily satisfy the commonality requirement of Rule 23(a)(2) as the trespass, nuisance, and negligence claims for each of the Class Members at issue will depend on the resolution of common questions of law and fact and each is complaining of the same injury. Essentially, the following questions apply uniformly to all Class Members:

---

[12] Put another way, commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury" such that their claims depend upon a common contention that is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. *See In re Deepwater Horizon*, 785 F.3d 1003, 1016 (5th Cir. 2015) (quoting *Wal-Mart*, 131 S.Ct. at 2551).

- Whether Defendants were the source of the iron PM found on Representative Plaintiffs' and Class Members' homes, vehicles, and other personal property;[13]

- Whether Defendants' actions and/or failures to act caused contaminants, in the form of iron PM, to enter the atmosphere;

- Whether Defendants' iron PM causing actions and/or failures to act were reasonable under the circumstances;

- Whether Defendants have been guilty of negligence, negligence *per se*, and/or gross negligence in their operation and emissions;

- Whether Defendants' operations have violated applicable air pollution standards, limits, permits, or other laws;

- Whether the iron particulate is capable of causing damage to homes, vehicles, and other personal property;

- Whether Plaintiffs and the Class Members have a remedy under substantive federal law for the wrongs complained of;

- Whether Plaintiffs and the Class Members have a remedy under substantive state law for the wrongs complained of;

- Whether Plaintiff and the Class Members sustained damages and are entitled to compensation as a consequence of Defendants' acts or omissions, and, if so, what is the proper measure and appropriate formula to be applied in determining such damages and compensation;

- The appropriate remedy for Plaintiffs and its value as recoverable damages.

- Whether the Court should issue injunctive relief to prevent future injury and damages to Plaintiffs and the Class Members that, in reasonable probability, they would suffer in the future as a result of Defendants' tortious conduct.

The answers to the above questions will allow the Court to determine discrete questions of law and fact that will resolve an issue central to each individual Representative Plaintiffs' and Class Members' claims. *See M.D. ex rel. Stukenberg,* 675 F.3d at 840. If the answer is "yes" to any of the above questions, that answer will apply to, and thus resolve an issue, for the entire class. *See Sterling,* 855 F.2d

---

[13] This is a question of general causation, as discussed in *Sterling v. Velsicol*, 855 F.2d 1188, 1200 (6th Cir. 1988), and has been found as a valid basis to certify a class under Federal Rule of Civil Procedure 23(b)(3).

at 1197 (recognizing that when a defendant's liability can be determined on a class-wide basis as a result of defendant's common course of conduct, a class action may be the best vehicle to resolve the controversy).

Moreover—while Representative Plaintiffs contend that each individual Class Member has had Defendants' Dust on, and adhere to, their homes, vehicles, and/or other personal property—that determination is not one that must be addressed at the certification stage because it would amount to a "determination of the truth or falsity of the parties' contentions, rather than an evaluation of those contentions' commonality." *See In re Deepwater Horizon*, 739 F.3d 790, 812 (5th Cir. 2014) ("This [merits-based finding] was not required by *Wal–Mart*, and was expressly ruled out in *Amgen*.").

### c. Typicality

Rule 23(a)(3) provides that "the claims or defenses of the representative parties [must also be] typical of the claims or defenses of the class." *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016). The typicality inquiry rests "less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of legal and remedial theories behind their claims." *Id.* at 528–29. "Typicality exists when the representative plaintiff's claims arise out of the same event or course of conduct as the other class members' claims, and all claims are based on the same legal theories." *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at *6 (S.D. Tex. Nov. 13, 2019) , *report and recommendation adopted*, No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 472 (N.D. Tex. 2001)).

"The test for typicality is not particularly demanding." *Booth v. Galveston Cty.*, No. 3:18-CV-00104, 2019 WL 1129492, at *5 (S.D. Tex. Mar. 12, 2019), *report and recommendation adopted*, No. 3:18-CV-00104, 2019 WL 1411664 (S.D. Tex. Mar. 28, 2019). The Supreme Court has recognized that "commonality and typicality . . . tend to merge," because both requirements "serve as guideposts for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the

interests of the class members will be fairly and adequately protected in their absence." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350 n.5.).

Here, Representative Plaintiffs and the Class Members' claims arise from the same events and are based on the same legal theories. First, Representative Plaintiffs and the Class Members claim to have suffered from the exact same actions, omissions, and conduct by Defendants that have allowed Defendants' Dust to contact (and damage) their homes, vehicles, and/or other personal property. *See id.* Second, the claims alleged by Representative Plaintiffs on behalf of the Class Members are based on the same legal theories—trespass, nuisance, and negligence. This satisfies Rule 23(a)(3)'s typicality requirement because the representative Plaintiffs' claims and the claims of the Class Members are so interrelated that the class members' claims will be adequately protected in their absence. *See id.*

### d.    Adequacy of Representation

The final requirement under Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Since class members are bound by the judgment, "the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." *See Berger v. Compaq Corp.*, 257 F.3d 475, 480 (5th Cir. 2001) (collecting cases). To do so, Plaintiffs must affirmatively prove that they are adequate class representatives. *See id.* at 481. The adequacy requirement also "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625 (internal citation omitted).

The adequacy analysis encompasses two separate inquiries: "(1) the willingness and ability of the named plaintiff[s] 'to take an active role in and control the litigation and to protect the interests of absentees'; and (2) 'the zeal and competence of the representative's counsel.'" *Booth*, 2019 WL 1129492, at *6 (quoting *Berger*, 257 F.3d at 479).

### i.    Adequacy of Representative Plaintiffs

"The Fifth Circuit has identified a 'generic standard' for the adequacy requirement, noting that 'class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Id.* (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 131–32 (5th Cir. 2005). Class representatives "need not be legal scholars" and instead "are entitled to work with, and rely upon, their counsel in pursuing their claims and navigating the complicated legal and factual issues associated with" complex litigation. *Id.* (quoting *Stoffels v. SBC Commc'ns, Inc.*, 238 F.R.D. 446, 455 (W.D. Tex. 2006)). "A class representative is considered adequate when he has familiarity with the complaint and the concept of a class action." *Id.* (internal quotations omitted).

The Representative Plaintiffs identified herein easily satisfy the adequacy requirement. They have volunteered their time to serve as the class representatives and have stated a genuine willingness to vigorously prosecute the interests of the class. Before agreeing to be included as representative plaintiffs, those individuals had in-depth discussions with class counsel identifying the responsibilities involved and expressed a willingness to respond to written discovery, provide deposition testimony, and testify at trial on the merits—and some of them have done so. Moreover, each class representative possesses a fundamental understanding of the case sufficient to allow them to actively participate in the lawsuit as it progresses. The Representative Plaintiffs' interests are completely aligned with those of the class such that there is no conflict of interest between the representative Plaintiffs and the class they seek to represent. *See ODonnell v. Harris Cty., Texas*, No. CV H-16-1414, 2017 WL 1542457, at *6 (S.D. Tex. Apr. 28, 2017) ("Each named plaintiff is a member of the class he or she seeks to represent, does not have claims in conflict with those of other class members, and adequately represents the class.").

The Representative Plaintiffs included herein adequately represent the interests of the absent Class Members as they hail from the different zones identified in the Class Area, have been involved

in each of the individuals Actions before this Court, prior to consolidation, and have varying degrees of interest in their respective residential property. For instance:

> **Blake Chapman:** Mr. Chapman has been a plaintiff in the *Chapman* Matter and has been actively involved in this litigation since 2017. Mr. Chapman previously owned a residence located in Zone 4.

> **Ricky Stephens:** Mr. Stephens has been a plaintiff in the *Chapman* Matter and has been actively involved in this litigation since 2017. Mr. Stevens owns his residence in the Bay Ridge Subdivision, located in Zone 1.

> **Gary Thurmond, Jr.:** Mr. Thurmond has been a Representative Plaintiff in the *Thurmond* Matter and has been actively involved in this litigation since 2019. Mr. Thurmond rents an apartment in Zone 6.

> **Carolyn Thurmond**: Ms. Thurmond has been a Representative Plaintiff in the *Thurmond* Matter and has been actively involved in this litigation since 2019. Ms. Thurmond owns a home in Zone 7.

> **Hortensia Martinez**: Ms. Martinez has been a Representative Plaintiff in the *Thurmond* Matter and has been actively involved in this litigation since 2019. Ms. Martinez occupies a home in the Bay Ridge Subdivision, located in Zone 1.

> **Charles Garrett:** Mr. Garrett has been a plaintiff in the *Abben* Matter and has been actively involved in this litigation since 2020. Mr. Garrett occupies a home in Zone 2.

> **Roel Garcia:** Mr. Garcia has been a Representative Plaintiff in the *Thurmond* Matter and has been actively involved in this litigation since 2019. Mr. Garcia owns a home in Gregory, Portland, located in Zone 3.

This proof shows that they are representative of the Class as a whole, have the willingness and ability to take an active role in and control the litigation, and protect the interests of the absent Class Members.

## ii.     Adequacy of Class Counsel

In determining whether class counsel is adequate under Federal Rule of Civil Procedure 23(a)(4), courts must evaluate the zeal and competence of class counsel. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002). Plaintiffs are represented by attorneys from Anderson Alexander, PLLC ("Anderson Alexander"), Liles White PLLC ("Liles White") and Frazer PLC ("Frazer Firm").

Plaintiffs will show that these attorneys specialize in complex multi-party collective, class, and mass actions on a nation-wide basis. *See* Exhibit 2, ¶¶ 4–15; and Exhibit 3, ¶¶ 3–9. Anderson Alexander is well equipped to handle the complex procedural and legal issues involved in representative actions and is prepared to (and has) invested significant time and resources in this litigation. *See* Exhibit 2, at ¶¶ 4–17. Liles White is likewise well versed in handling complex lawsuits involving significant personal injuries and property damages, and has extensive experience litigating such claims through trial on the merits. *See* Exhibit 3, at ¶ 3–9. The Frazer Firm specializes in toxic mass torts involving claims of pollution affecting large populations and understands the rigorous methodology implicit in such litigation. *See* Exhibit 2, at ¶ 11 and Ex. A.

Moreover, these firms have been actively litigating against Defendants since 2017, when the Dust complaints against Defendants began and have shown that they are capable of representing the interests of the absent class members. The zeal and competence of class counsel is sufficient, and Rule 23(a)(4) is satisfied.

### 2. Representative Plaintiffs Satisfy the Rule 23(b)(3) Factors

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individuals, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Taken together, these two requirements ensure that a proposed class has "sufficient unity, so that absent class members can fairly be bound by decisions of the class representatives." *See Amchem Products, Inc.*, 521 U.S. at 615. Determining whether common issues predominate and whether the class action is a superior procedural vehicle requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case. *See Berger*, 255 U.S. at 483.

### a.    Predominance

The predominance analysis requires that the Court identify "the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether the issues are common to the class." *Madison v. Chalmette Ref., LLC*, 637 F.3d 551, 555 (5th Cir. 2011). In order to "predominate," common issues must constitute a significant part of the individual cases. *See Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). The standard "does not require that all issues be common to all parties," but instead mandates that "resolution of the common questions affect all or a substantial number of the class members." *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992).

The common issues of fact and law herein surely predominate over individual issues. *See* Fed. R. Civ. P. 23(c)(4); Newberg, § 4.23 (4th ed.) (stating that the predominance test of Rule 23(b)(3) must be read with a recognition of the power of the court to uphold a class with respect to particular issues under Rule23(c)(4)). First, each Class Members' alleged damages flow from a single source—Defendants' La Quinta Plant. Second, Representative Plaintiffs plead the same legal and remedial theories under the same state laws with respect to Defendants' conduct, requiring class-wide proof of the significant common elements of recovery. Third, Representative Plaintiffs claim only property damages on behalf of themselves and the Class Members. Fourth, the case does not involve extensive conflicts of law analysis as there are no nationwide class management problems.

Further, Representative Plaintiffs sought compensatory damages based upon the same legal theories under Texas state law with respect to Defendants' conduct. This assures class-wide proof and resolution of all significant, common elements of compensatory damage recovery, including in this case, individual causation. The specific legal theories pled are: (1) trespass; (2) nuisance; and (3) negligence/negligence per se.

The substantive issues that would control the outcome are the same for all class members, and do not involve individual inquiry. This is true, in part, because of the limited scope of the geographic class. Here, Representative Plaintiffs are seeking certification of a class of plaintiffs who are all located within a three-mile radius of Defendants' La Quinta Plant. This, taken together with the air modeling performed by Representative Plaintiffs' experts and Defendants' experts, the investigations performed by those experts and the TCEQ, and voestalpine's own admissions, reduce if not eliminate questions related to significant disparities in terms of exposure, location, and mitigative steps. *See id.* at 557. Determinations relative to liability would be made using representative evidence applicable to the Class as a whole.

> In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

*Sterling,* 855 F.2d at 1197.

### b.    Superiority

Finally, courts must compare and "assess the relative advantages of alternative procedures for handling the total controversy" to decide if a class action is superior to other forms of litigation. *See In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013)  (quoting FED. R. CIV. P. 23(b)(3) Advisory Committee's Note to 1966 Amendment). "The superiority analysis is fact-specific and varies depending on the circumstances of each case." *Ibe*, 836 F.3d at 530.  The four factors courts consider are "(a) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; and (d) the likely difficulties encountered in managing a class action." *Amchem Prods., Inc.*, 521 U.S. at 615–16.

i.      <u>Interest in Individually Controlling Separate Actions</u>

The "interest" factor requires more than the desire of certain individuals to have their own separate lawsuits. Rather, such an interest exists where the individual has "special issues which require separate litigation." 7A, Wright, Miller & Kane, *Federal Practice & Procedure*, § 1780. Presumably, this factor pertains to the interests of most or all class members, rather than the interests of a few individual members—when a small segment of class members has a strong interest in individual litigation, that interest may be served by opting out. *See* Newberg, § 4.29 (4th ed.). Here, although a small percentage of homeowners initially brought individual claims in the *Thurmond* Matter and the *Abben* Matter, those causes have been consolidated (with the *Chapman* Matter) into one action before this Court. Thus, there is no known or foreseeable "interest" on behalf of a significant number of class members to individually prosecute their claims sufficient to defeat class certification. In fact, the opposite is true.

ii.     <u>Extent of Litigation Already Begun and Desirability of Concentrating Claims in the Corpus Christi Division of the Southern District of Texas.</u>

There are three cases pending before this Court involving voestalpine's iron PM emissions that have been consolidated into this cause—and will be resolved via the same Agreement. There is one other pending individual lawsuit against Defendant voestalpine Texas LLC, styled *Myron Rodrigue v. voestalpine Texas LLC*, Cause No. S-20-5902CV-B, pending in the 56th Judicial District Court, San Patricio County, Texas. However, should Mr. Rodrigue choose to continue his individual action against Defendant, he may do so by exercising his right to opt-out of the class. Likewise, Mr. Rodrigue may choose to return his Claim Form and benefit from the Agreement without necessitating further litigation. Accordingly, this factor supports a finding that class-action treatment is superior.

<u>Difficulties Managing a Class Action</u>

The third factor, manageability, addresses the "difficulties likely to be encountered in the management of a class action." Fᴇᴅ. R. Cɪᴠ. P. 23(b)(3)(D). Because the Parties are seeking certification of a settlement class, the future manageability of the proposed class action is not at issue, and "the Court need not address any issues of manageability that may be presented by certification of the class proposed in the Settlement." *Welsh v. Navy Fed. Credit Union*, No. 5:16-CV-1062-DAE, 2018 WL 7283639, at *19 (W.D. Tex. Aug. 20, 2018).

## E.    Tʜᴇ Nᴏᴛɪᴄᴇ, ᴀɴᴅ Nᴏᴛɪᴄᴇ Pʟᴀɴ, Cᴏɴsᴛɪᴛᴜᴛᴇ ᴛʜᴇ Bᴇsᴛ Pʀᴀᴄᴛɪᴄᴀʟ Nᴏᴛɪᴄᴇ

Rule 23(e) requires district courts to "direct notice in a reasonable manner to all class members who would be bound by the proposal" before approving a settlement. Fed. R. Civ. P. 23(e)(1). "Under Rule 23(e), a settlement notice need only satisfy the 'broad reasonableness standards imposed by due process.'" *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir.1999); 3 Nᴇᴡʙᴇʀɢ § 8:18 at 223 ("[T]he court's formulation of an adequate notice procedure under Rule 23(e) is limited only by constitutional due process considerations."). "The minimum of due process, as interpreted by the Supreme Court, is that 'deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Id.* (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Moreover, "[f]or classes certified under Rule 23(b)(3), the law demands 'the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.'" *Vaughn v. Am. Honda Motor Co.*, 627 F. Supp. 2d 738, 744 (E.D. Tex.), *stay granted, order amended sub nom. Vaughn v. Am. Honda Motor Co.*, 507 F.3d 295 (5th Cir. 2007) (citing Fed. R. Civ. P. 23(c)(2); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–74 (1974) (due process requires best notice practicable)).

Here, the notice given to absent class members comports with the Federal Rules of Civil Procedure as well as due process. The Claims Administrator will identify every residence (and every residence owner) in the Class Area for the duration of the Class Period. The Notice Packet will be mailed by First Class U. S. Mail to each residence and/or individual owner identified. The Parties have also arranged to have a Newspaper Notice published in the Corpus Christi Caller Times bi-monthly, for the duration of the Notice Period. The notice will also be published on the settlement website, along with the Agreement and other important case-related documents. The Notices are targeted to reach all identifiable Class Members and are reasonably targeted (through the Newspaper Notice) to reach those Class Members not identified in the Property Identification Plan.

The proposed Notices satisfy Rule 23(c)(2) because they contain sufficient information (i) to the nature of the action; (ii) to the definition of the class certified; (iii) to the class claims and issues; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) to the time and manner for requesting exclusion; and (vii) to the binding effect of a class judgment on members under Rule 23(c)(3). FED. R. CIV. P. 23(c)(2); *see also* Exhibits A, B, and I. The Notices include sufficient information to allow the Class Members to make an informed choice whether to approve or disapprove of the settlement, object, or opt-out. *C.f., In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 224 (5th Cir. 1981). Moreover, the Notices advise the Class Members of the time, date, and location of the scheduled Fairness Hearing, advise them that they may attend, and provide instructions by which the Class Members may be heard, if they choose to object.

The Parties in their Agreement have agreed to utilize "the best notice practicable under the circumstances" and the Notices satisfy the requirements of Federal Rule of Civil Procedure 23(c)(2). *See Vaughn*, 627 F. Supp. 2d at 744.

# V.
## CONCLUSION

Preliminary approval of the Agreement is appropriate because Plaintiffs have shown, at least preliminarily, that the settlement is fair, reasonable, and adequate. Moreover, certification of a class action, for settlement purposes only, is also warranted. This case satisfies the prerequisites of Rule 23(a) and the criteria of Rule 23(b)(3). Plaintiffs accordingly ask the Court to preliminarily approve the settlement agreement and certify the matter as a class action for settlement purposes only, appoint the undersigned as Class Counsel, authorize notice to be sent to Class Members as outlined herein, and grant all other proper relief as set forth in the Plaintiffs' Proposed Order.

Date: October 15, 2021                    Respectfully submitted,

**ANDERSON ALEXANDER, PLLC**

By:    */s/ Austin Anderson*
       Austin W. Anderson
       Federal I.D. No. 777114
       Texas Bar No. 24045189
       austin@a2xlaw.com
       Clif Alexander
       Federal I.D. No. 1138436
       Texas Bar No. 24064805
       clif@a2xlaw.com
       819 N. Upper Broadway
       Corpus Christi, Texas 78401
       Telephone: (361) 452-1279
       Facsimile: (361) 452-1284

**LILES WHITE PLLC**

By:    */s/ Stuart R. White*
       Stuart R. White
       Federal I.D. No. 11448833
       Texas Bar No. 24075268
       stuart@lileswhite.com
       Kevin W. Liles
       Federal I.D. No. 21501
       Texas Bar No. 00798329
       kevin@lileswhite.com
       500 N. Water Street, Suite 800
       Corpus Christi, Texas 78401
       Telephone: (361) 826-0100
       Facsimile: (361) 826-0101

**FRAZER PLC**

By:    */s/ T. Roe Frazer II*
       T. Roe Frazer II (*admitted Pro Hac Vice*)
       Tennessee Bar No. 35785
       roe@frazerlaw.com
       1 Burton Hills Blvd., Suite 215
       Nashville, Tennessee 37215
       Telephone: (615) 647-0990

**ATTORNEYS IN CHARGE FOR PLAINTIFFS
AND THE PUTATIVE CLASS MEMBERS**

## CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with Defendants' counsel of record and they are not opposed to the filing of this Motion or the relief requested herein.

/s/ *Austin Anderson*
Austin Anderson

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2021, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/ *Austin Anderson*
Austin Anderson

## Index of Exhibits

1.  Class Action Settlement and Release Agreement
2.  Declaration of Austin Anderson
3.  Declaration of Kevin Liles